UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANDACE CICOGNA, an individual,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>33ACROSS INC., a Delaware corporation; Does 1-10, inclusive,<br><br>　　　　　　　　　　Defendants. | Case No.: 16-CV-2012 JLS (WVG)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>(ECF No. 3) |

　　　　Presently before the Court is Defendant 33Across, Inc.'s Motion to Compel Arbitration and Stay or Dismiss the Action ("Mot. to Compel") (ECF No. 3.); Plaintiff Candace Cicogna's Memorandum of Points and Authorities in Opposition of Defendant 33Across, Inc.'s Motion to Compel Arbitration and Stay or Dismiss the Action ("Pl.'s Opp'n") (ECF No. 5); and Defendant's Reply in Support of 33Across, Inc.'s Motion to Compel Arbitration ("Def.'s Reply") (ECF No. 8). On September 23, 2016 the Court took the instant Motion under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). (Order Vacating Hr'g on Mot. to Compel 1, ECF No. 9.) Having considered the parties' arguments and the law, the Court **GRANTS** Defendant's Motion to Compel.

/ / /

/ / /

# BACKGROUND

## I. Procedural Posture and Plaintiff's Employment

Plaintiff instituted the present action on July 11, 2016 in the Superior Court of California for the County of San Diego, asserting claims against 33Across for (1) sex discrimination; (2) marital status discrimination; (3) wrongful termination in violation of public policy; (4) retaliation in violation of California's Fair Employment and Housing Act (Cal. Gov. Code § 12940 *et seq.*); and (5) retaliation in violation of California's Pregnancy Disability Leave Act (Cal. Gov. Code § 12945 *et seq.*). (*See* Def. 33Across, Inc.'s Notice of Removal of Action 1–2, ECF No. 1; *id.* at Ex. A, ¶¶ 18–57, ECF No. 1-2.) On August 10, 2016 Defendant removed the action to this Court, (*see generally id.*), and seven days later moved to compel arbitration pursuant to a signed agreement between Plaintiff and Defendant that Defendant alleges controls the instant controversy, (*e.g.*, Mot. to Compel 3–6).

Plaintiff factually alleges as follows. Plaintiff's initial employment agreement with Defendant ("Offer Letter") contained an arbitration provision that would control the claims here at issue but for the fact that it is invalid as unconscionable. (Pl.'s Opp'n 2–3.) Several months later, Plaintiff subsequently "receiv[ed] an email purportedly confirming that she accepted" a separate agreement with TriNet ("First TriNet Agreement"), (*id.* at 3–4), a "professional employer organization" with which Defendant contracted to administer and fulfill employment needs for its company, (Mot. to Compel 2–3). Plaintiff "does not recall receiving or reading" the First TriNet Agreement, nor does she "recall clicking an 'I Accept' button in order to complete her registration for the portal." (Pl.'s Opp'n 3–4.) Further, Plaintiff did not believe the First TriNet Agreement in any way affected her employment or post-termination rights with Defendant because she "never performed any work or services for TriNet's benefit" and Defendant never provided her with "any notification or documentation that classified her as an employee of TriNet." (*Id.* at 4.)

Approximately one month later, Plaintiff became pregnant with her first child, who was due in February 2016. (*Id.*) Plaintiff discussed her pregnancy with her manager in

September, and in January 2016 was informed by doctors that her pregnancy was "classified . . . as a high risk pregnancy," thus necessitating two to three weekly trips to the doctor for the remainder of her pregnancy term.  (*Id.*)  That same month, Defendant introduced Plaintiff to the employee who would cover her position during Plaintiff's maternity leave—this employee was a man.  (*Id.*)  The same day the introduction took place, Plaintiff digitally received a second agreement from TriNet ("Second TriNet Agreement"), which she had to accept in order to access TriNet's internet portal.  (*Id.*)  Plaintiff accepted the agreement without reading the terms, thinking that there was "no reason to believe the [Second TriNet Agreement] would be materially any different than the [First TriNet Agreement] or that it could have any bearing on her Employment Agreement with Defendant." (*Id.* at 4–5.)

Plaintiff subsequently went on maternity leave, returned to work approximately two months later, and was fired two weeks later.  (*Id.* at 5.)

## II. The Relevant Agreements

### A. Offer Letter

Plaintiff has attached to her Opposition her initial employment agreement with Defendant. (ECF No. 5-2.)  In relevant part, the Offer Letter states:

> [Y]our job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time . . . .
> . . . .
> You and the Company agree to waive any rights to a trial before a judge or jury and agree to arbitrate before a neutral arbitrator any and all claims or disputes arising out of this letter agreement and any and all claims arising from or relating to your employment with the Company . . . .
> . . . .
> The arbitrator's decision must be written and must include the findings of fact and law that support the decision. The arbitrator's decision will be final and binding on both parties, except to the extent applicable law allows for judicial review of arbitration awards. The arbitrator may award any remedies that would otherwise be available to the parties if they were to bring the dispute in court. The arbitration will be conducted in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association; provided, however that the arbitrator must allow the discovery

> that the arbitrator deems necessary for the parties to vindicate their respective claims or defenses. The arbitration will take place in New York, NY or, at your option, the county in which you primarily worked with the Company at the time when the arbitrable dispute or claim first arose.
>
> You and the Company will share the costs of arbitration equally. Both the Company and you will be responsible for their own attorneys' fees, and the arbitrator may not award attorneys' fees unless a statute or contract at issue specifically authorizes such an award.

(Cicogna Decl. Ex. 1 at 2–3.)

### *B. First TriNet Agreement and Second TriNet Agreement*

Defendant has attached to its Motion to Compel both the First and Second TriNet agreements. (ECF No. 3-2, 9–12, 14–17.) In relevant part, both the First and Second TriNet agreements state:

> In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions . . . , and present witnesses and evidence to present their cases and defenses.
> . . . .
> During the arbitration each party will pay his, her or its own attorneys' fees, subject to any remedies to which that party may later be entitled under applicable law. In all cases where the law requires it, TriNet (and, if applicable, any TriNet customer . . . interested in enforcing this DRP for its own benefit) will pay the arbitrator's and arbitration fees.
> . . . .

(Belloise Decl. Ex. A, at 2–3; *see id.* Ex. B at 8.)[1]  However, the First and Second agreements vary regarding the scope of the arbitration clauses. The First TriNet Agreement states only the following regarding the applicable scope of the arbitration clauses:

---

[1] Although inconsequential for purposes of the instant Motion, there are slight differences to the above-quoted language in the two agreements. Specifically, the Second Agreement adds language to account for the differences identified in the next part of this Section, *infra*, underlined as follows: "In arbitration, the parties will have the right to file motions challenging the pleadings (e.g. demurrer or motion to dismiss)" and "In all cases where law requires it, TriNet (and if applicable, any TriNet customer or employee(s) of either TriNet or a TriNet customer interested in enforcing this DRP for its/their own benefit . . . ." (Belloise Decl. Ex. B at 8 (emphases added).)

> This [Dispute Resolution Protocol and its relevant arbitration provisions] cover[] any dispute arising out of or relating to your employment with TriNet.

(*Id.* Ex. A, at 3.)  By contrast, the Second TriNet Agreement expands coverage, underlined as follows:

> Subject to the limitations in subsection (b), this [Dispute Resolution Protocol and its relevant arbitration provisions] cover[] any dispute arising out of or relating to your employment with TriNet <u>and/or, if you work for one of TriNet's customers, arising out of or relating to your employment with your company</u> . . . .
> . . . .
> [T]his DRP is the full and complete agreement for resolution of covered disputes between you and TriNet . . . <u>and/or, if you work for one of TriNet's customers, between you and your company (and its employees, officers and agents)</u>.

(*Id.* Ex. B, at 6–8 (emphases added).)

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the enforceability of arbitration agreements in contracts.  *See* 9 U.S.C. § 1, *et seq.*; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24–26 (1991).  If a suit is proceeding in federal court, the party seeking arbitration may move the district court to compel the resisting party to submit to arbitration pursuant to their private agreement to arbitrate the dispute. 9 U.S.C. § 4.  The FAA reflects both a "liberal federal policy favoring arbitration agreements" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotations and citations omitted); *see also Kilgore v. Keybank, Nat'l Ass'n*, 718 F.3d 1052, 1057 (9th Cir. 2013) (en banc) ("The FAA was intended to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law." (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 n.14 (1985))); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) ("The [FAA] not only placed arbitration agreements on equal footing with other contracts, but established a federal policy in favor of arbitration, . . . and

a federal common law of arbitrability which preempts state law disfavoring arbitration." (citation omitted)).

In determining whether to compel a party to arbitration, a court may not review the merits of the dispute; rather, a court's role under the FAA is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). If the Court finds that the answers to those questions are yes, the Court must compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). In determining the validity of an arbitration agreement, the Court applies state law contract principles. *Adams*, 279 F.3d at 892; *see also* 9 U.S.C. § 2. To be valid, an arbitration agreement must be in writing, but it need not be signed by the party to whom it applies as acceptance may be implied in fact. *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 233, 236 (2012). Further, "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause." *Id.*

## ANALYSIS

In the present case, Defendant argues that the Second TriNet Agreement should control the issue of arbitration. Plaintiff sets out several arguments opposing application of the Second TriNet Agreement's arbitration clause: (1) "Defendant did not meet its burden of proving to the Court that it has a valid and enforceable arbitration agreement[,]" (Pl.'s Opp'n 6–7); (2) neither of the two TriNet agreements control because (a) "Defendant is a non-signatory" to the First TriNet Agreement, (*id.* at 9–10), and (b) the Second TriNet Agreement is both procedurally and substantively unconscionable, and therefore unenforceable, (*id.* at 10); (3) the Offer Letter's arbitration agreement controls, and because the terms of the Offer Letter's arbitration agreement are both procedurally and substantively unconscionable it is unenforceable, (*id.* at 7–9). The Court addresses each in turn.

///

///

**I. Defendant's Proof of an Enforceable Arbitration Agreement**

Plaintiff does not dispute that Defendant in its Motion to Compel provided copies of both of the relevant TriNet agreements; instead, Plaintiff argues that Defendant did not provide a copy of the Offer Letter—either to Plaintiff's Counsel or the Court—despite Defendant confirming "that the arbitration agreement between the parties requiring Plaintiff to split arbitration costs existed . . . ." (*Id.* at 6–7.) Defendants respond by noting that "no one is seeking to enforce that arbitration clause in the offer letter" and that the "offer letter did not preclude the parties from adding additional terms and conditions." (Def.'s Reply 2, 2 n.1.) The Court agrees with Defendants, albeit for a much more basic reason.

Plaintiff's sole citations to legal authority supporting this line of argumentation are to California Code of Civil Procedure § 1281.2 and *Jones v. Jacobson*, 195 Cal. App. 4th 1 (2011), *as modified* (June 1, 2011). Together, these authorities establish that a party may move to compel arbitration and that the moving party bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. *Jones*, 195 Cal. App. 4th at 15 (citing in part Cal. Code Civ. P. § 1281.2). This is exactly what Defendants in the present case seek to do: "Because the [Second TriNet] Agreement signed by Plaintiff is valid and enforceable, and Plaintiff's claims are covered by the Agreement, the Court must compel Plaintiff to submit her claims to binding arbitration and dismiss or stay the proceeding pending the conclusion of the arbitration." (Mot. to Compel 17.) Plaintiff is the party that injected into this dispute the arbitration clause from the initial Offer Letter. Of course, Plaintiff can analytically attempt to establish that (1) the arbitration clause in the Second TriNet Agreement Defendant seeks to enforce is inapplicable to the present case; and (2) the arbitration clause in the First TriNet Agreement is unconscionable, and therefore also unenforceable; therefore (3) the arbitration clause from Plaintiff's Offer Letter applies to the present case; but (4) the arbitration clause from Plaintiff's Offer Letter is unconscionable; therefore (5) the Offer Letter's arbitration clause is also inapplicable to the present case; therefore (6) no arbitration clause is applicable to

the present case; and therefore (7) Defendant's Motion to Compel fails. However, Plaintiff's presently presented argument under California Code of Civil Procedure § 1281.2 and *Jones v. Jacobson* does nothing to further this line of analysis. Accordingly, the Court turns to Plaintiff's other arguments regarding the enforceability of the TriNet Agreements.

## II. Whether Either of the TriNet Agreements Control

Because if the Second TriNet Agreement is valid, it—rather than the First TriNet Agreement—controls the issues in this case, the Court first addresses the validity of the Second TriNet Agreement. Plaintiff's only argument against the validity of the Second TriNet Agreement is that the agreement is void due to unconscionability.

Under California law, "unconscionability has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (internal quotation marks omitted) (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486–87 (1982)). Procedural and substantive unconscionability "must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." *Id.* (emphasis original) (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1533, *as modified* (Feb. 10, 1997)). However, courts use a sliding scale in analyzing unconscionability as a whole, such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

In the present case, Plaintiff argues that the Second TriNet Agreement is procedurally unconscionable because (1) "Plaintiff was going through a high-risk pregnancy requiring her to visit her doctors 2 to 3 times per day[;]" and (2) "Plaintiff was forced to accept the agreement without negotiation because she was terrified" and needed to ensure "that she and her daughter were covered by healthcare approximately 3 weeks before she went on pregnancy leave." (Pl.'s Opp'n 10.) Plaintiff further argues that the Second TriNet Agreement is substantively unconscionable because (1) "Plaintiff had no

reason to believe that the interpretation of the Second TriNet arbitration agreement would be materially any different than the [F]irst TriNet arbitration agreement, or that it could have any effect on her Employment Agreement with Defendant[;]" and (2) "Plaintiff did not . . . contemplate that Defendant" would substantively change the terms of Plaintiff's initial Offer Letter via a third-party contract and without any prior notice to Plaintiff. (*Id.*) Although the Court agrees with Plaintiff that at least some aspects of the Second TriNet Agreement were marginally procedurally unconscionable, the Court nonetheless concludes that Plaintiff has not adequately shown unconscionability as a whole.

Defendant addresses Plaintiff's first two arguments by noting that "[c]ontract law . . . enjoys no 'pregnancy exception' . . . ." (Def.'s Reply 2.)  While this is undoubtedly true, such a bare statement alone misses the crux of Plaintiff's argument.  Plaintiff in this case was dealing with extensive and time-consuming medical problems and <u>had no prior notice</u> from Defendant that it would fundamentally change the terms of Plaintiff's and Defendant's employment agreement via what would appear to a layperson to be a third-party, ancillary contract.  Procedural unconscionability turns in part on "surprise," and in the present case such a manner of contract modification would likely be surprising to anyone, let alone an employee with medical complications severely limiting their time to carefully parse through innocuously presented legal documents. *See, e.g.*, *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (1982) ("'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.") (cited with approval by *Armendariz*, 24 Cal. 4th at 114).

However, as Defendant points out, and Plaintiff does not dispute, Plaintiff digitally signed the Second TriNet Agreement.  And Plaintiff should have at least contemplated that Defendant might change the terms of her initial Offer Letter.  The Offer Letter itself explicitly set forth that its terms could be changed at a later date, and both the First and Second TriNet agreements noted that Plaintiff's company "ha[d] entered into a customer service agreement with TriNet to share certain employer responsibilities <u>as co-employers.</u>"

(Belloise Decl. Ex. A, at 1 (emphasis added); *id.* Ex. B at 5 (emphasis added).) Furthermore, Plaintiff argues that when she accepted the Second TriNet Agreement she thought that the substance of the arbitration provisions set forth in her Offer Letter would continue to control her employment relationship. But there is no indication she <u>initially</u> thought the Offer Letter's arbitration provisions were unconscionable. True, Plaintiff now goes to great lengths to argue that the Offer Letter's arbitration provisions were unconscionable, but she fails to prove why accepting the <u>more Plaintiff-friendly provisions</u> of the Second TriNet Agreement—even assuming she did so without notice of such change—amounts to procedural unconscionability.[2]

Finally, although Plaintiff places certain arguments under the substantive unconscionability section of her Opposition, none actually address substantive unconscionability. Perhaps this is because substantive unconscionability turns on overly harsh or one-sided results, and here the arbitration provisions of the Second TriNet Agreement easily exceed the threshold for arbitration agreements set forth in *Armendariz*. *Compare* 24 Cal. 4th at 102–14 (noting valid arbitration agreement requires: (1) provision of a neutral arbitrator; (2) provision of more than minimal discovery; (3) provision requiring arbitrator to issue a written decision; (4) provision of same remedies that would otherwise be available to the employee in court; and (5) employee not to bear costs unique to the arbitration), *with* (Belloise Decl. Ex. B, at 8). Accordingly, given that the Second TriNet Agreement is not in any way substantively unconscionable, Plaintiff's overall unconscionability argument must fail regardless of any level of procedural unconscionability.

---

[2] Admittedly, a person unexpectedly discovering that a newly signed agreement has terms more favorable to that person than the last agreement might constitute surprise. However, the doctrine of unconscionability is not meant to guard against pleasant surprises. *See A & M Produce Co.*, 135 Cal. App. 3d at 486 ("[U]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965))); *id.* at 487 ("[S]ubstantive unconscionability must be evaluated as of the time the contract was made.").

In sum, an unconscionability determination is committed to a court's discretion. *See Armendariz*, 24 Cal. 4th at 122. Here, the Second TriNet Agreement is at best slightly procedurally unconscionable, and is in no way substantively unconscionable. Given the foregoing, although the Court is not unsympathetic to the difficulties Plaintiff has faced, the Court nonetheless cannot legally exercise its discretion to declare the Second TriNet Agreement unconscionable.[3]

## CONCLUSION

In light of the Court's unconscionability analysis, and Plaintiff's valid acceptance of the terms of the Second TriNet Agreement, the Second TriNet Agreement's arbitration provisions control the instant dispute. Accordingly, the Court **GRANTS** Defendant's Motion to Compel. Furthermore, pursuant to the FAA, the Court **STAYS** the judicial proceedings pending the outcome of any arbitration. *See* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."); *Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.*, 586 F.2d 143, 147 (9th Cir. 1978) (holding that courts shall order a stay of judicial proceedings "pending compliance with a contractual arbitration clause").

**IT IS SO ORDERED.**

Dated: December 8, 2016

Hon. Janis L. Sammartino
United States District Judge

---

[3] Because the Court concludes that the Second TriNet Agreement controls, there is no need to determine whether the Offer Letter's arbitration provisions were unconscionable.